# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 21-cv-23701-ALTMAN

**KIMBERLY HOSTERT**,

  *Plaintiff,*

*v.*

**CARNIVAL CORPORATION**,

  *Defendant.*

_____/

## <u>ORDER</u>

Our Plaintiff, Kimberly Hostert, was onboard a Carnival cruise ship when she slipped on a wet floor and fell. Seeking redress for her injuries, Hostert sued Carnival, asserting claims of negligent maintenance, negligent failure to warn, negligent failure to correct a known dangerous condition, and vicarious liability. *See generally* Amended Complaint [ECF No. 92].

After some litigation, Carnival moved for summary judgment on all of Hostert's claims. *See generally* Defendant's Renewed Motion for Summary Judgment ("MSJ") [ECF No. 97]. Hostert responded to the MSJ, *see generally* Plaintiff's Response to Defendant's Renewed Motion for Summary Judgment ("Response") [ECF No. 98], and Carnival replied, *see generally* Defendant's Reply in Support of Its Renewed Motion for Summary Judgment ("Reply") [ECF No. 103]. After careful review—and taking the evidence in the light most favorable to Hostert—we deny summary judgment and proceed to trial.

### THE FACTS[1]

Hostert was a passenger on Carnival's "Horizon" cruise ship on January 24, 2020. That night, Carnival was holding an outdoor movie night. *See* Deposition of Kimberly Hostert ("Hostert Dep.") [ECF No. 75-1] at 108:21–23. Hostert planned on watching the movie from Deck 11. *Ibid.* (agreeing that she was "going up to the deck to watch [the] movie"). After having dinner with her boyfriend, Hostert made her way to Deck 11, while her boyfriend went to the casino. *Id.* at 108:7–10 ("And then he wanted to go to the casino, so I don't remember if I walked him to there and then I went up; I went up alone.").

Hostert stepped onto Deck 11 "between 7:45 [p.m.] and 8:00 o'clock." *Id.* at 106:21–22; *see also id.* at 142:24–143:2. After taking "three" or "four" steps, however, Hostert felt her left "shoe slide" and her leg "twist[ ]" under her, and she fell, *id.* at 125:7–17, landing on her back and bottom, *id.* at 125:23–126:14. When she landed, she noticed that she was "sitting in a puddle" and that the "complete deck was wet." *Id.* at 129:19–130:2. She didn't see any liquid on the floor *before* she fell, but she did start to feel the wetness on her foot as she was slipping. *Id.* at 133:7–10 ("[W]hen my shoe slipped, I

---

[1] "The facts are described in the light most favorable to the non-moving party." *Plott v. NCL Am., LLC*, 786 F. App'x 199, 201 (11th Cir. 2019); *see also Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002) ("[F]or summary judgment purposes, our analysis must begin with a description of the facts in the light most favorable to the [non-movant]."). We accept these facts for summary-judgment purposes *only* and recognize that "[t]hey may not be the actual facts that could be established through live testimony at trial." *Snac Lite, LLC v. Nuts 'N More, LLC*, 2016 WL 6778268, at *1 n.1 (N.D. Ala. Nov. 16, 2016); *see also Cox Adm'r US Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion may not be the actual facts. They are, however, the facts for present purposes[.]" (cleaned up)). In considering Carnival's MSJ, then, we describe the facts in the light most favorable to Hostert and rely on Carnival's Statement of Undisputed Material Facts ("Carnival SOF") [ECF No. 96] *only* where Hostert has failed to genuinely dispute a proposition Carnival has asserted there, *see* S.D. FLA. L.R. 56.1(b) ("All material facts set forth in the movant's statement filed and supported as required above will be deemed admitted unless controverted by the opposing party's statement provided that the Court finds that the movant's statement is supported by evidence in the record.").

could feel the water[.]"). Hostert doesn't know how long the floor was wet before she slipped on it—and she doesn't know how it got that wet. *Id.* at 132:22–133:3.

"[A]round 7:00 p.m."—or at least forty-five minutes before Hostert slipped—Debra Gardner, an unrelated passenger on the Horizon, walked out to Deck 11 with her husband to watch the movie. Deposition of Debra Gardner ("Gardner Dep.") [ECF No. 75-2] at 8:12–15. Gardner and her husband nestled into a "loveseat[.]" *Id.* at 7:23–8:2. During her deposition, Gardner testified that Deck 11 "was dark" that night because the overhead lights "were off." *Id.* at 14:18–21. Still, Gardner "knew that the floor was wet when [she] sat down," *id.* at 22:10–14, because she could see the floor "shimmering from . . . lighted cubes" that served as "coffee tables" on the deck, *id.* at 13:7–10, 51:3–6; *see also* Photo of the "Lighted Cubes" [ECF No. 81-5].

Before Hostert fell, Gardner saw someone she thought was a Carnival crewmember wearing a "uniform" and "cleaning the tables and throwing away trash and emptying ashtrays" in the area. *Id.* at 18:12–13, 18:20–21, 34:13–15. Gardner saw the male crewmember go "up and down, he was in front of [her], he went up and down the entire side. [She] saw him . . . several times," and he was "walk[ing] through the area where [ ] Hostert slipped." *Id.* at 34:16–35:8. Gardner even tipped the crewmember for cleaning her table. *Id.* at 35:18–20. But Gardner didn't see this crewmember (or anyone else) try to "mop the area, or place any caution or warning signs in the area" before Hostert's accident. *Id.* at 25:5–9.

Gardner, who was about ten feet from Hostert when she fell, saw the whole thing. *See id.* at 12:4–6; *see also* Hostert Dep. at 149:17–20. After watching Hostert slip and fall, Gardner walked over and sat down on the floor next to her—which (she recalls) was wet. *See* Gardner Dep. at 22:18–20. Hostert stayed on the floor for "at least a half an hour" before Carnival's medical team got to her. Hostert Dep. at 155:1–5. Hostert sustained a "patella fracture to [her] left knee," which required surgery to repair. *Id.* at 176:23–177:2, 178:5–14.

It's not clear whether it rained on the day Hostert fell. Hostert testified that it was "nice out" that day and that it hadn't rained. *Id.* at 11:4–5, 115:22. She also said that it wasn't raining when she slipped. *Id.* at 116:6–15. But Carnival's records cut both ways. In one report (dated January 24, 2020, at 7:45 p.m.), the reporting officer marked "Clear Sky" under the "Weather" category, leaving all other possible options—including "Mist," "Overcast," "Partly Cloudy," "Rain," "Showers," "Squally Showers," and "Thunderstorms"—unmarked. *See* Jan. 24, 2020, Weather Report [ECF No. 81-6]. On the other hand, the "Accident Summary Report," which lists the "[a]ccident[s] that occurred after the last AIFT[2] meeting held on January 24, 2020 until February 22, 2020," says, in the entry for Hostert's accident, that the "[f]loor was wet as it was raining." Feb. 2020 Accident Summary Report [ECF No. 81-14] at 1. And Gardner's testimony isn't clear either. At her deposition, she initially didn't remember that it was raining when she walked out onto Deck 11, *see* Gardner Dep. at 16:2–9, but she later recalled that it "either had rained or it was raining," *id.* at 17:6–8. Still later, she attested that it either was raining or was "going to rain." *Id.* at 45:20–46:1. She definitely didn't remember it raining at any point between when she nestled into the loveseat and when Hostert fell. *Id.* at 24:4–8 ("We were not getting wet sitting there."). And Gardner was "able to see other people watching the movie on the deck below [her] in an uncovered or an open area[.]" *Id.* at 28:9–14.

Carnival's HESS Procedures for Prevention of Slips, Trips, and Falls in Accommodation[3] ("HESS Procedures") mandate that "[a] warning sign indicating slippery conditions on deck must be prominently displayed on all open decks when wet due to weather conditions, cleaning routines, or as deemed necessary by ship's management." HESS Procedures [ECF No. 81-4] at 3. The HESS Procedures also require crewmembers to respond to spills *quickly* by: (1) "[s]ecuring the immediate area around the spill"; (2) "[p]reventing passengers or crew from walking through/over the spill"; (3)

---

[2] We don't know what this is because the parties never tell us.
[3] Carnival's HESS Procedures set forth "the basic requirements for accident prevention in accommodation areas" on the company's cruise ships. HESS Procedures at 2.

"[c]leaning the spill or request[ing] assistance"; and (4) not "leav[ing] the area until the spill has been cleaned and the risk of slip removed." *Id.* at 2–3. The Horizon's Hotel Director also testified that these policies for preventing "slips, trips, and falls in the accommodation areas, including the open decks and so on are everyone's responsibility"—in other words, that they "apply to every team member onboard." Deposition of Pavol Dimaj ("Dimaj Dep.") [ECF No. 81-10] at 75:1–13. And Carnival's Director of Claims and Staff Counsel testified that Carnival employees should "start to try" drying or clearing "standing water" from a rainstorm "within 15 or 20 minutes" of the rain's cessation. Deposition of Suzanne Vazquez ("Vazquez Dep.") [ECF No. 75-4] at 121:1–4.

THE LAW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *Ibid.*

At summary judgment, the moving party bears the initial burden of "showing the absence of a genuine issue as to any material fact." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."). Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to "come forward with specific facts showing there is a genuine issue for trial." *Bailey v. Allgas,*

*Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The Court, in ruling on a motion for summary judgment, "need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3); *see also Green v. Northport*, 599 F. App'x 894, 895 (11th Cir. 2015) ("The district court could consider the record as a whole to determine the undisputed facts on summary judgment."). In any event, on summary judgment, the Court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001).

In sum, then, if there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial. *Whelan v. Royal Caribbean Cruises Ltd.*, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (Ungaro, J.). On the other hand, the Court must grant summary judgment if a party "has failed to make a sufficient showing on an essential element of her case." *Celotex*, 477 U.S. at 323; *see also Lima v. Fla. Dep't of Child. & Families*, 627 F. App'x 782, 785–86 (11th Cir. 2015) ("If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." (quoting *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir. 1994))).

## ANALYSIS

"Federal maritime law applies to actions arising from the alleged torts committed aboard a ship sailing in navigable waters." *Smith v. Royal Caribbean Cruises, Ltd.*, 620 F. App'x 727, 729 (11th Cir. 2015) (citation omitted). "Along with our judicially created body of maritime law, we 'rely on general principles of negligence law' in analyzing a maritime tort case." *Willis v. Royal Caribbean Cruises, Ltd.*, 77 F.4th 1332, 1336 (11th Cir. 2023) (quoting *Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 710, 720 (11th Cir. 2019)). We thus "rely on state law as a supplement" to federal maritime law—but only so long as

state law doesn't "alter or overrule federal maritime law." *Diaz v. Carnival Corp.*, 555 F. Supp. 3d 1302, 1306 (S.D. Fla. 2021) (Torres, Mag. J.).

Carnival moves for summary judgment on all four counts of the Amended Complaint. On the direct-liability claims (Counts I–III), Carnival says that Hostert has failed to create a genuine dispute of material fact on the tort-law element of duty—specifically, that she's failed to show Carnival had actual or constructive notice of the dangerous condition on Deck 11. *See* MSJ at 5 ("Carnival is entitled to summary judgment on all three direct liability negligence claims (Counts I-III) because . . . Plaintiff cannot establish that Carnival was on notice of the alleged dangerous condition (i.e., an unreasonably slippery wet deck)."). This argument borders on frivolity. On the vicarious-liability claim (Count IV), Carnival argues that Hostert hasn't identified a negligent employee, hasn't shown that any such employee was acting within the course of his employment with Carnival, and hasn't established that the employee committed a single negligent act. *Id.* at 12 ("Carnival respectfully submits that the evidence in this case does not sufficiently identify any specific Carnival crewmember who was allegedly negligent nor is there any evidence that such crewmember was acting within the course and scope of his employment with Carnival at the time of the alleged negligence."); *id.* at 16 ("As there is no evidence that any specific crewmember breached any duty owed to Plaintiff and was, therefore, negligent under any of Plaintiff's theories [DE 92, ¶52(a)-(e)], Carnival respectfully submits that it is entitled to summary judgment in its favor on Plaintiff's vicarious liability claim."). We disagree. Finally, as to all four claims (Counts I–IV), Carnival contends that Hostert hasn't done enough to get to a jury on the tort-law element of causation. Again, frivolous.

## I.     The Direct-Liability Claims (Counts I–III)

"[T]he benchmark against which a shipowner's behavior must be measured is ordinary reasonable care under the circumstances, a standard which requires, as a prerequisite to imposing liability, that the carrier have had actual or constructive notice of the risk-creating condition, at least

where, as here, the menace is one commonly encountered on land and not clearly linked to nautical adventure." *Keefe v. Bahama Cruise Line, Inc.*, 867 F.2d 1318, 1322 (11th Cir. 1989). "In other words, a cruise ship operator's duty is to shield passengers from known dangers (and from dangers that should be known), whether by eliminating the risk or warning of it. Liability for a cruise ship operator thus hinges on whether it knew or should have known about the condition." *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1178 (11th Cir. 2020) (cleaned up).

A slip-and-fall plaintiff may prove constructive knowledge through circumstantial evidence. So, for instance, "[a] maritime plaintiff can establish constructive notice with evidence that the defective condition exist[ed] for a sufficient period of time to invite corrective measures." *Hodson v. MSC Cruises, S.A.*, 2021 WL 3639752, at *7 (S.D. Fla. Aug. 2, 2021) (Goodman, Mag. J.) (alteration in original & cleaned up), *report and recommendation adopted*, 2021 WL 3634809 (S.D. Fla. Aug. 16, 2021) (Moreno, J.). And that's consistent with Florida law, which makes clear that a slip-and-fall plaintiff may prove constructive knowledge through "circumstantial evidence," showing *either* that "[t]he dangerous condition existed for such a length of time that, in the exercise of ordinary care, the business establishment should have known of the condition" *or* that "[t]he condition occurred with regularity and was therefore foreseeable." FLA. STAT. § 768.0755(1).

The Eleventh Circuit has found that a period as short as ten minutes may be sufficient to put a defendant on constructive notice of a dangerous condition. *See Lebron v. Royal Caribbean Cruises Ltd.*, 818 F. App'x 918, 922 (11th Cir. 2020) (reversing directed verdict on issue of constructive notice where the "unsafe condition existed for at least ten minutes"); *see also D'Antonio v. Royal Caribbean Cruise Line, Ltd.*, 785 F. App'x 794, 798 (11th Cir. 2019) (reversing summary judgment and finding that "eighteen minutes was a sufficient period to present a genuine issue of material fact" on the question of constructive notice). A slip-and-fall plaintiff may also "establish constructive notice with evidence of substantially similar incidents in which conditions substantially similar to the occurrence in question

must have caused the prior accident." *Guevara*, 920 F.3d at 720 (cleaned up). Or she could show that the defendant's employees were "in the vicinity of where the fall occurred," such that they *should've* known of the dangerous condition. *Plott v. NCL Am., LLC*, 786 F. App'x 199, 203 (11th Cir. 2019) (quoting *Markowitz v. Helen Homes of Kendall Corp.*, 826 So. 2d 256, 261 (Fla. 2002)); *see also Haiser v. MSC Cruises (USA) Inc.*, 2019 WL 4693200, at *5 (S.D. Fla. Aug. 9, 2019) (Smith, J.) (finding that the crewmembers "should have known about the presence of water on floor since they were in the immediate vicinity").

Lastly, "circumstantial evidence of a business owner's neglect in inspecting its premises may establish constructive knowledge." *Garcia v. Wal-Mart Stores E., L.P.*, 2015 WL 898582, at *3 (M.D. Fla. Mar. 3, 2015) (Byron, J.). Neglect can come in many forms, but it most commonly arises when a business violates its own policies and procedures—or when it fails to inspect its premises within reasonable time increments. *See ibid.* ("[C]ircumstantial evidence of a business owner's neglect in inspecting its premises may establish constructive knowledge. The most common examples are when a business owner fails to follow its own implemented inspection procedures or fails to inspect its premises at a reasonable rate."); *see also Kenny v. United States*, 2012 WL 523624, at *3 (M.D. Fla. Feb. 16, 2012) (Whittemore, J.) ("The Supervisor's Handbook demonstrates that the Post Office was acutely aware of the risk of injury from wet floors and had procedures in place to address that risk."); *Jenkins v. Brackin*, 171 So. 2d 589, 591 (Fla. 2d DCA 1965) (inferring constructive knowledge where grocery store failed to inspect its floors fifteen to twenty minutes before the plaintiff fell).

In trying to assess *how long* a substance has been sitting on a floor, courts look to several factors, including "evidence of footprints, prior track marks, changes in consistency, [or] drying of the liquid." *Palavicini v. Wal-Mart Stores E., LP*, 787 F. App'x 1007, 1012 (11th Cir. 2019). We also ask whether the "offending liquid" was "dirty" or "scuffed." *Norman v. DCI Biologicals Dunedin, LLC*, 301 So. 3d 425, 429 (Fla. 2d DCA 2020); *see also, e.g.*, *Woods v. Winn Dixie Stores, Inc.*, 621 So. 2d 710, 711 (Fla. 3d DCA

1993) ("Testimony of dirt, scuffing, or tracks in a substance generates sufficient inferences of constructive notice."); *Winn-Dixie Stores, Inc. v. Guenther*, 395 So. 2d 244, 246 (Fla. 3d DCA 1981) ("Here, testimony that the liquid was dirty and scuffed and had several tracks running through it was, in our opinion, adequate to impute constructive notice of the hazardous condition to the store manager.").[4] In our case, of course, we don't need *circumstantial* evidence to show that Deck 11 was wet for a long time because we have *direct* evidence—in the form of Gardner's testimony—that the floor was wet for *at least forty-five minutes* before Hostert fell.

Beyond the length of time, courts are more likely to find that a business had constructive notice when the business's employees were "in the vicinity of where the fall occurred." *Plott*, 786 F. App'x at 203 (quoting *Markowitz*, 826 So. 2d at 261); *see also Haiser*, 2019 WL 4693200, at *5 (finding that the crewmembers "should have known about the presence of water on floor since they were in the immediate vicinity"). That's because, with employees in the area, a jury can reasonably infer (at least where the condition is visible) that those employees *should have seen* the dangerous condition.

Drawing all reasonable inferences in Hostert's favor, we think a jury *could* find that Carnival knew (or *should've* known) about the wet floor Hostert slipped on.

*First*, there's evidence that the water had been sitting for a significant amount of time. Gardner testified that Deck 11 was wet when she "sat down," Gardner Dep. at 22:10–14, which was "around 7:00 p.m.," *id.* at 8:15—or *at least* forty-five minutes before Hostert slipped, *see* Hostert Dep. at 106:21–22 (attesting that she slipped "between 7:45 and 8:00 o'clock"). And, although she didn't need to for summary-judgment purposes, Hostert has corroborated Gardner's testimony that the deck was "shimmering from . . . lighted cubes," *id.* at 51:3–6, by submitting photos of those cubes and the

---

[4] As we explained in a similar case: "It's no surprise that courts often rely on these little nuggets of circumstantial evidence. After all, a customer shopping in a store doesn't tend to notice the puddle before he slips on it. And, even if he had, he'd rarely have occasion to measure the amount of time that elapsed between the substance's appearance on the floor and his encounter with it." *Torres v. Wal-Mart Stores E., L.P.*, 555 F. Supp. 3d 1276, 1283 n.8 (S.D. Fla. 2021) (Altman, J.).

surrounding wet floor, *see* Photo of the Lighted Cubes. That's probably enough to deny summary judgment all on its own. *See Lebron*, 818 F. App'x at 922 (reversing directed verdict on issue of constructive notice where the "unsafe condition existed for at least ten minutes"); *D'Antonio*, 785 F. App'x at 798 (reversing summary judgment and finding that "eighteen minutes was a sufficient period to present a genuine issue of material fact" on the question of constructive notice).

*Second*, we have a Carnival employee walking (and cleaning) in the *immediate* vicinity of the puddle just minutes *before* Hostert fell—a fact that further supports Hostert's position that someone at Carnival *should* have known. As we've explained, Gardner testified that "there was someone" wearing a crewmember "uniform" who "was cleaning tables and emptying ashtrays" in the area where Hostert slipped—*just before* the fall. Gardner Dep. at 18:12–21. This crewmember in a uniform even accepted a tip from Gardner. *Id.* at 35:18–20. As if that weren't enough, Gardner also specifically remembered that the crewmember had walked over the "area where [ ] Hostert slipped[.]" *Id.* at 35:5–8.

*Third*, Carnival's HESS Procedures—which apply to "every team member onboard" the Horizon, Dimaj Dep. at 75:1–13—provide that "[a] warning sign indicating slippery conditions on deck must be prominently displayed on all open decks when wet due to weather conditions, cleaning routines, or as deemed necessary by ship's management." HESS Procedures at 3. They also require all crewmembers to address slipping hazards *quickly* by: (1) "[s]ecuring the immediate area around the spill"; (2) "[p]reventing passengers or crew from walking through/over the spill"; (3) "[c]leaning the spill or request[ing] assistance"; and (4) not "leav[ing] the area until the spill has been cleaned and the risk of slip removed." *Id.* at 2–3. Even Carnival's Director of Claims and Staff Counsel, Suzanne Vazquez, conceded that employees should "start to try" drying or clearing "standing water" from a rainstorm "within 15 or 20 minutes" of its cessation. Vazquez Dep. at 121:1–4. Again, "[t]he most common examples [of a business owner's neglect] are when a business owner fails to follow its own

implemented inspection procedures or fails to inspect its premises at a reasonable rate." *Garcia*, 2015 WL 898582, at *3; *see also Kenny*, 2012 WL 523624, at *3 ("The Supervisor's Handbook demonstrates that the Post Office was acutely aware of the risk of injury from wet floors and had procedures in place to address that risk."). Despite all this, it's undisputed that no one cleaned the wet area where Hostert slipped—even though Gardner testified that it had been wet for *at least* forty-five minutes.

The Eleventh Circuit's treatment of similar cases lends further support to our conclusion. In *Plott*, for example, the Eleventh Circuit found a genuine issue of material fact on the question of NCL's constructive notice of the alleged dangerous condition and reversed the district court's order granting summary judgment. In that case, as here, the puddle on which the plaintiff slipped "remained in the area, which was 'continuously monitored,' for about half an hour before" the plaintiff slipped. 786 F. App'x at 203. From this, the court inferred—as we do—that "a reasonable factfinder could conclude that those crewmembers knew or should have known about the wet Conservatory floor and should have either removed the hazard or warned [the plaintiff] of it." *Ibid.*

Our case is very similar. There's evidence that the floor was wet for *at least* forty-five minutes before Hostert slipped, and an independent third party saw a Carnival crewmember (who was working in the area) walk over the area where Hostert fell just a few minutes before the fall. As in *Plott*, these facts are more than sufficient to raise a reasonable inference that the water had been there long enough for Carnival to see it.

A similar series of events animated the decision in *Lebron*, where the Eleventh Circuit reversed the district court's order granting the defendant's motion for a directed verdict on the question of constructive notice. The *Lebron* plaintiff tripped on an ice-skating rink. 818 F. App'x at 919. After the district court issued its directed verdict for Royal Caribbean, the Eleventh Circuit found that the "jury was entitled to find Royal Caribbean had constructive notice of the gouge in the ice" based on three facts—all present in our case. *Id.* at 922.

12

*One*, the court pointed to Royal Caribbean's "general knowledge of the unsafe condition at issue"—a conclusion it reached in part because of an employee's testimony that "it is important to maintain and resurface the ice to prevent accident and injury." *Ibid.* Similarly, here, Carnival's HESS Procedures—which apply to every crewmember—require employees to dry up wet floors quickly. *See generally* HESS Procedures; *see also* Dimaj Dep. at 75:1–13 (admitting that the procedures apply to "every team member"); Vazquez Dep. at 121:1–4 (conceding that employees should "start to try" drying or clearing "standing water" from a rainstorm "within 15 or 20 minutes" of its cessation).

*Two*, the *Lebron* panel pointed to testimony that, on the day in question, "gouges in the ice were readily visible ten to fifteen minutes prior to [the plaintiff's] fall," which established "that the unsafe condition existed for at least ten minutes and that the condition was detectable by a lay person on or around the ice." *Lebron*, 818 F. App'x at 922. Here, too, the overwhelming independent evidence—including Gardner's first-hand account of what happened—strongly suggests that the floor was wet for some protracted amount of time and that "the condition was detectable by a lay person[.]" *Ibid.*; *see also* Gardner Dep. at 22:13–14 ("I knew the floor was wet when I sat down.").

*Three*, "provid[ing] the final inference for constructive notice," three employees were "stationed in the immediate vicinity of the ice, one of whom was specifically tasked with watching the ice." *Lebron*, 818 F. App'x at 922. In our case, Gardner testified that she saw a Carnival employee working in the precise area of Deck 11 where, minutes later, Hostert would slip and fall. *See* Gardner Dep. at 18:12–13, 18:20–21, 34:16–35:8. And, again, Carnival's HESS Procedures require all crew members to clean wet floors quickly.

And those decisions barely scratch the surface. *See, e.g.*, *Torres*, 555 F. Supp. at 1284 (denying summary judgment where there was "evidence that the water had been accumulating for a significant period of time" and that a Wal-Mart employee was "walking in the immediate vicinity of the puddle just moments *before* [the plaintiff] fell" (emphasis in original)); *Maxwell v. Carnival Corp.*, 2021 WL

1969967, at *6 (S.D. Fla. Mar. 18, 2021) (Bloom, J.) (denying summary judgment where the evidence indicated "that the food spill was on the floor for a period long enough for at least one other person to walk through it and for Defendant to have constructive notice of the substance"); *Snider-Hancox v. NCL Bahamas Ltd.*, 2018 WL 6308683, at *6 (S.D. Fla. Sept. 26, 2018) (Martinez, J.) (denying summary judgment where there was "a footprint in the liquid as well as dirt and grime in the puddle prior to the fall," and the area "was being staffed by at least three . . . employees at the time of the accident" who "could have noticed a liquid on the ground and understood the safety concern of that condition"); *Garcia v. Target Corp.*, 2014 WL 505151, at *3 (S.D. Fla. Feb. 7, 2014) (Marra, J.) (denying summary judgment where "there were footprints in the water on the floor . . . despite the fact that there is evidence that it was not raining the day Plaintiff fell in the store," raising "a genuine issue of material fact as to whether Defendant knew there was water on the floor but ignored it or should have discovered it earlier"); *Williams v. Carnival Corp.*, 440 F. Supp. 3d 1316, 1322 (S.D. Fla. 2020) (Torres, Mag. J.) (finding that Carnival had constructive notice of water on the ground where "a slow drip of water coming from a leaky ice chest immediately next to the puddle of water" could have taken "hours" to pool into a two-foot puddle, and noting that Carnival, as here, had "employees working close to the [water] trained to look for and remedy wet decks"); *Erickson v. Carnival Cruise Lines, Inc.*, 649 So. 2d 942, 943 (Fla. 3d DCA 1995) ("We conclude that the source of the puddle (i.e. ceiling leak) as well as the size of the puddle were sufficient to create a jury question as to whether this hazardous condition existed for a sufficient period of time to charge appellee with constructive notice and to invite corrective measures.").

Against all this, Carnival advances two arguments—both unavailing.

*First*, Carnival contends that it's entitled to summary judgment because Hostert hasn't produced any "passenger complaints and/or prior incidents" that would've placed it on constructive notice that "water on the API Syntheteak deck in the subject area rendered the deck unreasonably

slippery." MSJ at 7. But prior incidents are just one way in which a plaintiff in a slip-and-fall case can show constructive notice. *See Guevara*, 920 F.3d at 720 (explaining that a plaintiff can establish constructive knowledge *either* with evidence that the "defective condition exist[ed] for a sufficient period of time to invite corrective measures" *or* "with evidence of substantially similar" prior incidents (cleaned up)); *Torres*, 555 F. Supp. at 1283 (explaining that a plaintiff can establish constructive knowledge *either* with evidence that the "dangerous condition existed for such a length of time that, in the exercise of ordinary care, the business establishment should have known of the condition" or that falls "occurred with regularity and w[ere] therefore foreseeable" (cleaned up)). And, as we've explained, a jury *could* find that Carnival *should've* known of the dangerous condition based on (1) Gardner's testimony that the floor was wet for *at least* forty-five minutes before Hostert fell; (2) Gardner's testimony that a crewmember walked over the area where Hostert fell just a few minutes before the fall—*without* cleaning the floor; and (3) Carnival's own policies, which would have required that crewmember (among others) to address—and clean—the wet floor. In any event, Hostert *has* produced evidence of prior incidents. In response to Hostert's interrogatories, in fact, Carnival disclosed *four* "slip and fall" incidents on the same kind of flooring Hostert slipped on in *just* the "3 years prior to the incident[.]" *See* Carnival's Suppl. Answers to Pl's. Interrogs. [ECF No. 96-1] at 19. Notably, three of those incidents involved "wet" or "moist" floors. *Ibid.*

  *Second*, Carnival contends that, "in order to survive summary judgment, [Hostert] must establish, through competent evidence, not only that Carnival knew there was water on the deck in the area where [Hostert] fell, but also that Carnival knew that water on the deck rendered the deck unreasonably slippery (i.e. constituted a dangerous condition)." MSJ at 6–7; *see also* MSJ at 5 (arguing that, "in order to survive summary judgment, [Hostert] must point to record evidence that establishes that the deck in the area where Plaintiff fell was **unreasonably slippery** when wet." (emphasis in original)). But that's absurd. *Of course* wet floors are dangerous. That's why Hostert slipped and fell.

That's why all of the plaintiffs in all of the cases we've cited above slipped and fell. And it's why Carnival's *own procedures* make clear that wet floors are dangerous—and that, as a result, *all crewmembers* have an obligation to clean up wet floors quickly. *See generally* HESS Procedures; *see also* Dimaj Dep. at 75:1–13 (admitting that the procedures apply to "every team member"); Vazquez Dep. at 121:1–4 (conceding that employees should "start to try" drying or clearing "standing water" from a rainstorm "within 15 or 20 minutes" of the rain stopping). To crib from one of our colleagues: "The [HESS Procedures] demonstrate[ ] that [Carnival] was acutely aware of the risk of injury from wet floors and had procedures in place to address that risk." *Kenny*, 2012 WL 523624, at *3.

Nothing in those HESS Procedures suggests that Carnival employees are free to ignore wet floors so long as the dangerousness of the floors' wetness hasn't been independently established. Any such exception would swallow the commonsense rule that employees have a duty to dry wet floors before someone slips on them. In any event, Carnival's argument—silly as it may be—is really an argument for the jury at trial. "Yes, it was wet," Carnival should say. And "yes, our employee failed to clean it up." And, "sure, our policies require us to clean up those floors precisely because they are dangerous." But "take it from me, Carnival's lawyer: *These* wet floors, despite Ms. Hostert's injuries, just *aren't* dangerous." And the jurors will be free to believe this defense if they choose to do so. But the fact that Carnival may have a defense at trial isn't an argument for granting its motion for summary judgment, because a reasonable jury might *disbelieve* this defense and find that wet floors are, as logic seems to suggest, *inherently* dangerous.

Carnival cites two district court cases for its view that summary judgment is appropriate unless a slip-and-fall plaintiff can show that the *specific* wet floor at issue was more dangerous than others. *See* MSJ at 5 (citing *Luther v. Carnival Corp.*, 99 F. Supp. 3d 1368 (S.D. Fla. 2015) (Williams, J.); and then citing *Wish v. MSC Crociere S.A., and MSC Cruises (USA) Inc.*, 2008 WL 5137149 (S.D. Fla. Nov. 24, 2008) (Marra, J.)). But these cases say no such thing. And, if they did, we wouldn't follow them. *See*

*Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." (quoting 18 J. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 134.02[1][d] (3d ed. 2011)); *see also Gables Ins. Recovery v. United Healthcare Ins. Co.*, 39 F. Supp. 3d 1377, 1383 n.5 (S.D. Fla. 2013) (Altonaga, J.) (same).

In *Luther*, the court granted Carnival summary judgment on the plaintiff's slip-and-fall claim because "her testimony ma[de] clear that she was aware of the wet deck, and that the danger was apparent and obvious." 99 F. Supp. 3d at 1371. The plaintiff there *admitted* that "she recognized and appreciated the risk of slipping when walking on the deck" and that she "noticed the wetness of the deck and stepped 'prudently.'" *Ibid.* Trying to circumvent the plaintiff's (probably dispositive) concession, the plaintiff's lawyer in *Luther* asked the court not to enter summary judgment because, while the dangerous condition *was* open and obvious to the plaintiff, the wet floor in that case was "unusually, extremely, or unreasonably slippery." *Ibid.* The court wisely rejected this ridiculous claim.

As should be obvious already, *Luther*'s facts are the opposite of ours. There's no evidence in our case that Hostert knew about the wet floor—and yet still walked over it. On the contrary, the evidence is uncontested that Deck 11 "was dark" that night because the overhead lights "were off." Gardner Dep. at 14:18–21. And Hostert specifically testified that she *didn't know* the floor was wet. Here's that part of her deposition:

Q. But you did not see anything on the floor prior to your fall, correct?

A. Correct.

Hostert Dep. at 129:15–18. So, far from trying to show—like the plaintiff in *Luther*—that the wet floor she slipped on was somehow *different* than other wet floors, our Plaintiff is just saying that wet floors are wet floors are wet floors. Ironically, Carnival is the one parroting the plaintiff's losing position in *Luther*—by suggesting, as she had, that this case is different than other slip-and-fall cases

because there's something unique about the floor in question: In *Luther*, the plaintiff's claim was that the floor's uniqueness lay in its being *more* slippery than other wet floors; here, Carnival's claim is that the floor's uniqueness lay in its being *less* slippery than other wet floors. Either way, that claim fails.

*Wish* helps Carnival even less. Judge Marra decided that case *after a bench trial*—not on summary judgment—and the court expressly weighed the evidence against the plaintiff. *See Wish*, 2008 WL 5137149, at *1 n.1 (finding the plaintiff's "recollection [ ] less reliable" than another witness's "based on [the plaintiff's] testimony that she was in great pain and thus obviously focused on her injuries" and concluding, contra the plaintiff's testimony, that it was raining when she slipped). We cannot do that here. *See Pennington*, 261 F.3d at 1265 (requiring that, at summary judgment, we "review the facts and all reasonable inferences in the light most favorable to the non-moving party"); *Ilias v. USAA Gen. Indem. Co.*, 61 F.4th 1338, 1350 (11th Cir. 2023) ("But matters of credibility are for a jury to settle at trial, not a trial court on summary judgment."); *Cendan v. Sch. Bd. of Broward Cnty., Fla.*, 628 F. Supp. 3d 1191, 1201 (S.D. Fla. 2022) (Altman, J.) ("[A]ssessments of credibility—no less than the weighing of evidence—are fact questions not susceptible of disposition at summary judgment." (alteration in original & cleaned up)).

But *Wish* is also different in other meaningful ways. In that case, after all, Judge Marra noted that, *even assuming* it hadn't been raining when the plaintiff slipped, "there [wa]s no evidence to suggest how long the water had been on the pool deck before [the plaintiff's] fall," and (he added) "there [wa]s no evidence to suggest that Defendant was negligent in failing to remove promptly the rainwater." 2008 WL 5137149, at *2. There was thus "simply no evidence showing that the rainwater had been sitting on the pool deck for an unreasonable amount of time or that Defendant knew there was rainwater on the deck and acted negligently in failing to remove it." *Ibid.* Our case—as we've said—is just the opposite. Gardner testified that the wet condition had persisted for *at least* forty-five minutes

and that a Carnival crewmember had walked around the wet area without cleaning it—all in direct violation of Carnival's own policies. *Wish* is thus neither here nor there.

Carnival also suggests that *Guevara*, which Hostert cites, *see* Response at 7, "actually supports Carnival's position," Reply at 5. But that's not true. In the portion of *Guevara* Carnival relies on, the Circuit—addressing an unilluminated light bulb (not wet floors)—found no "triable issue of fact on whether NCL had notice of the allegedly dangerous condition posed by the unilluminated lightbulb." *Guevara*, 920 F.3d at 723. The court reached that conclusion in part because the plaintiff couldn't "identify when the light went out" and thus "failed to make a sufficient showing that the dangerous condition was 'present for a period of time so lengthy as to invite corrective measures.'" *Ibid.* (quoting *Keefe*, 867 F.2d at 1322). Again, that's just the opposite of our case, where an independent third party (with nothing to gain from this litigation) testified that the wet condition had persisted for at least forty-five minutes and that a Carnival crewmember had walked around the wet area without ever cleaning it—all in direct violation of Carnival's own policies.

***

While businesses "are not general insurers of their" customers, *Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 710, 726–27 (11th Cir. 2019) (Sutton, J., sitting by designation & concurring in part), they still bear certain obligations towards their customers. In our case, there's more than enough evidence for a reasonable jury to find that Carnival *should've known* about the water on Deck 11. To the extent Carnival is right—that there remain here certain unresolved, but important, factual disputes—we think it beyond cavil that the task of resolving those disputes rests squarely with a jury of laymen, not a panel of (unelected) judges. *Cf. Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 343–44 (1979) (Rehnquist, J., dissenting) ("Trial by a jury of laymen rather than by the sovereign's judges was important to the founders because juries represent the layman's common sense, the 'passional elements in our nature,'

19

and thus keep the administration of law in accord with the wishes and feelings of the community" (quoting OLIVER WENDELL HOLMES, COLLECTED LEGAL PAPERS 237 (1920))).

## II.     Vicarious Liability

A plaintiff asserting a vicarious-liability claim against a business for the negligent acts of its employee must "identify [the] specific crewmember whose negligence caused [her] injury" and prove that the "negligence occurred while [the employee was] acting within the scope of [his] employment." *Holland*, 50 F.4th at 1094.

Hostert alleges that the employee Gardner observed working in the area around where she slipped acted negligently by failing "to take corrective action, such as cleaning and drying the wet area, cordoning off the wet area, placing warning signs or cones, warning passengers traversing the area, or calling other crewmembers to take these steps if that crewmember was unable to do so." Am. Compl. ¶¶ 47, 51. Carnival counters that (1) Hostert hasn't sufficiently identified the Carnival employee who was allegedly negligent; (2) there's no evidence that the employee was acting within the scope of his employment; and (3) there's no evidence that the employee acted negligently. We'll address—and reject—each of Carnival's arguments in turn.

*First*, Hostert has done more than enough to identify the crewmember who (allegedly) acted negligently. As we've said, Gardner—an independent third party with nothing to gain from this lawsuit—testified that she saw a Carnival crewmember, wearing a "uniform," "cleaning the tables[,] and throwing away trash and emptying ashtrays" in the area Hostert slipped on—just minutes before the fall. Gardner Dep. at 18:12–21, 34:13–15. Gardner saw the employee go "up and down, he was in front of [her], he went up and down the entire side. [She] saw him . . . several times," including "walk[ing] through the area where [ ] Hostert slipped." *Id.* at 34:16–35:8. Gardner even tipped the crewmember after he cleaned her table. *Id.* at 35:18–20.

On this issue, our case looks a lot like Magistrate Judge Goodman's decision in *Hodson*. The cruise line there asked for summary judgment on the plaintiff's vicarious-liability claim because she "did not adequately identify the employee who was purportedly negligent." 2021 WL 3639752, at *11. Rejecting this argument, the court noted that the plaintiff saw an unnamed employee wearing a "uniform" with a "name tag" who had instructed her to take the stairs she eventually slipped on. *Id.* at *12. MSC tried to cast doubt on the plaintiff's testimony by explaining that "some third-party vendors on the ship, such as those who work in the wine program, wear name tags and uniforms but are not MSC employees." *Id.* at *11. Unmoved, Magistrate Judge Goodman explained that the "description of the speaker as a person in a uniform and wearing a name tag is *some* evidence to support an inference that the person was an MSC employee" and found that a "a reasonable jury could conclude that the uniformed person was in fact an MSC employee." *Ibid.* (emphasis in original).[5]

---

[5] Carnival attacks Hostert's reliance on *Hodson* as "unpersuasive" given the Eleventh Circuit's subsequent decision in *Holland*. Reply at 7. But *Holland* said only that a slip-and-fall plaintiff must identify the "specific crewmember whose negligence caused [her] injury" and prove that the "negligence occurred while acting within the scope of [his or her] employment[.]" 50 F.4th at 1094. As we've said, Hostert has met both requirements. The problem in *Holland* was that, "other than the claims' titles and the conclusory allegation asserting that Carnival was vicariously liable, there [wa]s nothing in [the plaintiff's] complaint that would lead one to understand his claims as seeking to impose liability on an otherwise nonfaulty Carnival for an employee's negligence." *Ibid.* The court noted that the plaintiff's complaint "did not identify any specific crewmember whose negligence caused [her] injury" and alleged *only* that (1) Carnival owed him "a duty of reasonable care for his safety" and that (2) Carnival had "actual and/or constructive notice of the dangerous condition"—both of which "are relevant to a claim based on Carnival's direct liability for its own negligence," rather than vicarious liability for its *employee's* negligence. *Id.* at 1094–95. None of those problems are present in our case. *One*, far from suggesting (in her vicarious-liability count) that Carnival was *itself* directly negligent, Hostert has alleged that Carnival should be held liable for the negligence of the *specific crewmember* Gardner observed. *Two*, none of Hostert's vicarious-liability allegations can be plausibly construed as conclusory or speculative. They are, after all, based on the specific—and quite detailed—eyewitness account of an independent third party who observed the active negligence of an apparent Carnival employee. *Three*, and in any event, nothing in *Holland* requires a slip-and-fall plaintiff to identify the offending crewmember by name, rank, and serial number—a requirement that would make little sense in an industry that regularly staffs its ships with *temporary* employees from around the world who, after short stints on ships, often return home.

Hostert's facts are even stronger in two ways. *One*, we're not here relying on the (potentially) self-serving testimony of the Plaintiff. As we've said, an independent third party (Gardner) attested to these facts in unrebutted testimony. *Two*, Carnival hasn't even argued—as MSC did in *Hodson*—that the crewmember might've been an employee of an unaffiliated staffing company. So, the man Gardner saw was *either* a Carnival employee *or* a passenger. Given this binary choice, the man's decision to spend his time cleaning ashtrays and tables, throwing out trash, and accepting tips is plainly sufficient to get to a jury on Hostert's claim that he *wasn't* on vacation.

To this last point, Carnival's suggestion that there "is no record evidence that the man observed by Gardner was actually a Carnival crewmember" because she "testified only that some unidentified male wearing 'shorts and a polo [shirt]' was in the area prior to Plaintiff's fall and that she saw him clean off a table and empty an ashtray," MSJ at 11–12, is thus difficult to entertain with a straight face. True, "shorts and a polo" are "an outfit that could just as easily describe the outfit of any male passenger on a cruise"—especially because Gardner didn't recall the man "wearing a name tag" or see "any Carnival logo[.]" *Id.* at 12. But (it bears repeating) the man was cleaning tables and ashtrays, *see* Gardner Dep. at 18:8–13 ("there was someone who was cleaning the tables and ashtrays"), "throwing away trash," *id.* at 34:13–14, and accepting tips, *id.* at 35:20. We (admittedly) haven't spent much time on cruise ships, but we can't imagine that guests regularly dress up in uniform, voluntarily clean tables and ashtrays, throw away other people's trash, and then accept cash tips from passengers for doing so.

*Second*, Carnival says there's no evidence that this crewmember—if he was a crewmember— was acting within the scope of his employment. Again, absurd. "Generally, the existence of an agency relationship is a question of fact that should be determined by a jury." *Kadylak v. Royal Caribbean Cruise, Ltd.*, 167 F. Supp. 3d 1301, 1310 (S.D. Fla. 2016) (Scola, J.). But a court "may grant summary judgment, if no reasonable juror could conclude that an employee's negligent actions were taken within the scope

of employment." *Ibid.* "In determining if acts occur within the course of employment, a court should consider whether '(a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master, and (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.'" *Ibid.* (quoting RESTATEMENT (SECOND) OF AGENCY § 228). Since there's no allegation that any force was used in our case, the fourth factor just doesn't apply here. But the other three weigh decisively in Hostert's favor.

Again, the crewmember was seen wearing (what appeared to be) a Carnival uniform, cleaning tables, throwing out trash, dumping out ashtrays, and accepting tips. That's unambiguously the kind of work a crewmember would be "employed to perform"; it evidently occurred "within the authorized time and space limits" of the job—it having been performed on a cruise ship *while* the cruise was sailing across the open sea; and we don't see how the decision to spend one's time cleaning ashtrays and throwing out other people's trash could be "actuated, at least in part," by anything *other* than a desire "to serve the master[.]" *Kadylak*, 167 F. at 1301.

*Third*, Carnival claims that Hostert failed to "establish that a specific Carnival employee was <u>negligent</u> (i.e., that a Carnival crewmember breached a duty owed to [Hostert] which proximately caused her incident and/or damages)." MSJ at 13 (emphasis in original). Carnival says that the "record is devoid of any evidence to support any of [Hostert's] alleged theories of negligence on the part of the alleged crewmember or any other crewmember." *Ibid.* This may be the silliest one yet.

Hostert alleges that Carnival's employees were negligent by, among other things, (1) "fail[ing] adequately to clean the area where Plaintiff fell"; (2) "fail[ing] adequately to dry the area where Plaintiff fell after cleaning it"; . . . (4) "failing to inspect the area adequately for dangerous wetness"; and/or (5) "failing to warn passengers including the Plaintiff of the wet or slippery area through placement of adequate signs or markings, cordoning off the dangerous area, delivery of oral or written warnings, or

otherwise." Am. Compl. ¶ 52(a)–(e). And she's adduced more than sufficient proof to support these allegations.

As we've said, Carnival's *own policies* require employees to put up "[a] warning sign indicating slippery conditions . . . on all open decks when wet due to weather conditions, cleaning routines, or as deemed necessary by ship's management." HESS Procedures at 3. The HESS Procedures also instruct employees to address spills *quickly* by securing the affected area, preventing passengers from walking through the area, cleaning the spill or requesting assistance, and not "leav[ing] the area until the spill has been cleaned and the risk of slip removed." *Id.* at 2–3. These policies (we've made abundantly clear) "apply to every team member onboard" the Horizon. Dimaj Dep. at 75:1–13. True, these policies don't fix the standard of care for negligence. But Carnival's policies *can* be relevant to the fact-finder's determination of *what* the standard of care might be. *See Mayo v. Publix Super Markets, Inc.*, 686 So. 2d 801, 802 (Fla. 4th DCA 1997) ("We clarify that a party's own internal operating manuals are admissible if relevant to the issues raised. We reiterate, however . . . that a party's internal rule does not itself fix the legal standard of care in a negligence action[.]"). As we explained in a similar case:

> The jury might find these policies useful in their efforts to outline the outer boundaries of the applicable standard of care. And, if they decide that the policies are, in salient ways, coextensive with the legal standard, then we think they *could* use the employees' failure to adhere to those policies as substantive evidence of negligence.

*Thompson v. Wal-Mart Stores E., L.P.*, 2022 WL 59678, at *6 n.7 (S.D. Fla. Jan. 6, 2022) (Altman, J.).

Despite these unambiguous policies, *no one* cleaned the dangerous condition that had persisted on the floor of a dark deck for *at least* forty-five minutes before Hostert fell. Gardner (recall) testified that she "knew that the floor was wet when [she] sat down" at around 7:00 p.m., because she could see the deck "shimmering." Gardner Dep. at 22:13–14, 35:5–8. She also said—as we've detailed—that a Carnival crewmember "walk[ed] through the area where [ ] Hostert slipped" shortly before the fall. *See id.* at 38:4–5. And, while the crewmember appeared to be engaged in many work-related tasks— cleaning, for instance—Gardner was clear that he didn't "mop the area, or place any caution or

warning signs in the area." *Id.* at 25:5–9. We therefore agree with Hostert that a reasonable jury *could* find that the crewmember acted negligently.

### III.   Causation

Lastly, Carnival (ignoring most of Hostert's evidence and some of its own) says there's no "evidence that any negligence by Carnival and/or any Carnival crewmember proximately caused the deck to become wet and/or . . . [Hostert]'s fall." MSJ at 16. That's just not true.

Before we get into the merits, though, we should note that Hostert's claims aren't contingent on Carnival's having "caused the deck to become wet." *Ibid.* Her principal theory, in fact, is that— *however* the deck became wet—Carnival was negligent by *either* not cleaning it up *or* not warning its passengers of the dangerous condition. *See* Response at 7 (arguing that, "[r]egardless of the source of the water[,] . . . the crewmember cleaning tables, if exercising reasonable care, should have detected and addressed it"). And Hostert has done more than enough to show that Carnival's negligence caused her injuries.

*First*, Hostert testified that she slipped on the wet floor of Deck 11, *see* Hostert Dep. at 125:3– 127:23, and that she landed in a puddle of water, *id.* at 129:24. *Second*, Gardner testified that the floor was wet when she first stepped out onto Deck 11—including in the area where Hostert fell—and that, when she walked over to Hostert after she fell, the floor under (and around) her was *still* wet. *See* Gardner Dep. at 22:10–20. *Third*, Carnival prepared an "Accident Summary Report for February 2020," which indicates that Hostert's "left foot slipped on the wet API floor" and that she "fell down . . . and sustained fracture [sic] to left knee cap." Feb. 2020 Accident Summary Report at 1. Hostert, in short, has adduced substantial evidence from which a reasonable jury *could* find that the floor was wet, that it was wet for a long time, that no Carnival crewmember cleaned it (even though a Carnival crewmember was working in the area where Hostert later fell), and that—as a result of the fall— Hostert fractured her knee.

Still resisting, Carnival insists that Hostert's fall was the "result of her own negligence, including but not limited to her failure to pay attention to her surroundings and/or failure to exercise reasonable care for her own safety while walking on the deck." MSJ at 17. As support for this proposition, Carnival cites (wait for it) *its own* "Accident Summary Report," in which some Carnival employee lists the "IMMEDIATE CAUSE/ROOT CAUSE" of the accident as a "[f]ailure to check/monitor surroundings[.]" Feb. 2020 Accident Summary Report at 1. Obviously, we won't grant summary judgment—where we must take all the evidence in the light most favorable to the *Plaintiff* and draw all reasonable inferences in the *Plaintiff's* favor, *Anderson*, 477 U.S. at 247–48—on the *Defendant's* recitation of the facts. In any event, the Accident Summary Report's post-hoc *opinion* about what might have caused the accident is (very probably) inadmissible hearsay—it being an out-of-court statement offered for the truth of the matter and authored by someone who *wasn't present* when the accident occurred. *See Org. of Pro. Aviculturists, Inc. v. Kershner*, 564 F. Supp. 3d 1238, 1247 (S.D. Fla. 2021) ("The general rule is that inadmissible hearsay cannot defeat a motion for summary judgment where there is no indication that it is reducible to a form that would be admissible at trial.").[6]

Finally, Carnival tries to make much of Hostert's testimony that she didn't look down at the floor before she slipped. *See* MSJ at 17 (quoting Hostert Dep. at 123:17–22). But Deck 11 "was dark" that night because the overhead lights "were off," Hostert Dep. at 14:18–21—so we're not sure what purpose looking down would've served. In any event, it's probably fair to say that reasonable people don't walk around looking down at the floor—because, if they did, we should expect many more accidents from people bumping into things and, on cruise ships especially, falling overboard.

*\*\*\**

---

[6] For whatever it's worth, Hostert also credibly counters Carnival's interpretation of the Accident Summary Report, arguing that it "presumably refers to the failure of the crewmember cleaning the tables in the area to monitor his surroundings adequately in order to detect and address the dangerously wet deck." Response at 4–5.

After careful review, therefore, we **ORDER and ADJUDGE** that Carnival's Renewed Motion for Summary Judgment [ECF No. 97] is **DENIED**.

**DONE AND ORDERED** in the Southern District of Florida on January 4, 2024.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record